UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
L.V. on behalf of herself
and her minor child, J.V.2,

                                  Plaintiffs,                  19-CV-5451 (AT)

                                                       **SECOND AMENDED COMPLAINT**

          -against-

                                                       **JURY TRIAL DEMANDED**

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                                  Defendant.
------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1. This action is being filed by Plaintiff L.V., a young Hispanic, single mother of two mixed-race children, both of whom suffer from autism spectrum disorder ("ASD" or "autism"), J.V.1 and J.V.2, on behalf of herself and one of her children – her son, Plaintiff J.V.2. J.V.1, L.V.'s daughter, is eight; J.V.2, her son, is four.

2. Plaintiffs L.V. and J.V.2 bring their federal claims pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1400-1482 (the "IDEA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12134, 12141-12165 (the "ADA"), and their respective implementing regulations; and 42 U.S.C. § 1983, alleging that Defendant, the New York City Department of Education (the "DOE"), and their employees, agents, and contractors, violated Plaintiffs' federal rights. Plaintiffs also claim that Defendant violated the New York State Constitution; the New York State Education

Law §§ 3202, 3203, 4401, *et seq.*, and implementing regulations; and other New York State common laws.

3.  Plaintiff J.V.2 is a qualified individual with disabilities, including autism, as defined under the IDEA, Section 504, and the ADA. His disabilities impact his ability to make progress in his cognitive, developmental, academic, and functional areas. He exhibits delays in his social-emotional, behavioral, language, speech, communication, and sensory functioning.

4.  Plaintiffs claim Defendant failed and continue to fail to ensure that Plaintiff J.V.2 receives an appropriate education, including special education services to address his educational needs.

5.  Plaintiffs claim Defendant failed and continue to fail to provide a legally adequate due process system to address the complaints from L.V. regarding her children's special education needs.

6.  J.V.2 is currently experiencing substantial regression due to Defendant's illegal, systemic policies, procedures, and practices, as well as Defendant's failures to respect Plaintiffs' basic due process rights and Defendant's consistent failures to provide special education and related services.

7.  J.V.2 requires equitable relief to enforce his entitlement to a Free Appropriate Public Education ("FAPE").

8.  J.V.2 also needs emergency relief requiring Defendant to implement the Interim Order on Pendency dated September 12, 2018, and the Interim Order Modifying Pendency Order dated March 12, 2019, both issued by IHO Jeffrey J. Schiro, Esq.

9.  Plaintiffs claim that Defendant has been and continue to be in violation of the IHO Modifying Pendency Order by their continued failure to provide J.V.2 with the mandated and related services enumerated therein. *Ibid*.

10. The academic, socio-emotional, and cognitive harm being perpetrated against Plaintiff J.V.2 by Defendant is immeasurable and irreparable. No child can reacquire time lost from an education Defendant denied to him.

11. Defendant repeatedly failed to address Plaintiff L.V.'s daily pleas for services for J.V.2. The emotional toll Defendant's failures have caused and continue to cause Plaintiff L.V. is also irreparable. Plaintiff L.V. cannot reacquire quality time with her child, which was lost because Defendant failed to comply with the law.

12. Without equitable and emergency relief, both Plaintiffs will continue to suffer irreparable harm.

13. Plaintiff L.V. has repeatedly attempted to exhaust administrative remedies. Due to Defendant's improper actions and their delays – systemic and procedural, however, Plaintiffs have not yet been able to obtain consistent or effective relief.

14. Because Plaintiffs raise emergency and systemic claims, and because Plaintiffs also allege deficiencies in the overall structure of the administrative proceedings meant to address the educational and related-service needs of children with disabilities and their respective parents, including those of L.V. and J.V.2, further exhaustion of administrative remedies is neither reasonably possible nor required.

## PARTIES

15. Plaintiff L.V. is the natural mother of Plaintiff J.V.2, her four-year-old son, who suffers *inter alia* from ASD or autism.

16. Plaintiff J.V.2 is a qualified individual with disabilities as defined under the IDEA, Section 504, and the ADA.

17. Plaintiff J.V.2 lives in Staten Island, New York with his mother L.V. and his sister J.V.1, who is eight years old. J.V.1 also has ASD or autism recognized and defined under the IDEA, Section 504, and the ADA.

18. J.V.2 is eligible for a FAPE under the IDEA. He became eligible to start receiving a FAPE on XXXXX, 2018 when he turned three.

19. Initials are used throughout this First Amended Complaint to preserve the confidentiality of sensitive personal, medical, educational, and disability-related information of L.V., J.V.1, and J.V.2, as they are discussed herein, and pursuant to the IDEA, Section 504, the ADA, and the Family Educational Rights and Privacy Act of 1974 ("FERPA").

20. Defendant DOE, also known as the Board of Education of the City of New York (the "Board" or the "BOE"), is a corporate body created by and existing under the laws of the State of New York pursuant to §§ 2551 and 2590 of the Education Law. Pursuant to various provisions of that law, including, *inter alia*, §§ 2554 and 2590-g, the BOE is charged with several responsibilities including, administering and managing the educational affairs of the New York City School District and serving as the employer of all educators hired to teach in the New York City School District.

21. In conjunction with amendments to the State Education Law enacted in 2002, most powers of the BOE were diverted to the Chancellor, with the Board's administrative operations assigned to a body denominated by the Mayor as the New York City Department of Education (the "DOE"). The Board also conducts business as the Panel for Education Policy (the "PEP").

22. Defendant DOE's central office is located at 52 Chambers Street, New York, New York 10007. For the purposes of this First Amended Complaint, the Board, the Department of Education, and the Panel for Education Policy, are collectively referred to as the DOE.

23. Defendant DOE is a duly constituted School District organized under the laws of the State of New York; it is the official body charged with developing policies with respect to the operation and administration of the New York City public schools under N.Y. Educ. Law § 2590, and other state and city laws and applicable implementing regulations for the children who reside within the geographic boundaries of New York City under N.Y. Educ. Law § 3202(1).

24. Defendant DOE is the Local Educational Agency ("LEA") and is responsible for providing a Free Appropriate Public Education (a "FAPE") under the IDEA to all disabled children in New York City. Defendant is also individually and/or jointly responsible for delivering educational services to children in New York City under New York State Education Laws.

25. Defendant DOE is a recipient of federal funds within the meaning of Section 504 and the ADA.

26. New York State receives federal funding under the IDEA and has established procedures for providing special education services to children with disabilities as set forth in N.Y. Educ. Law §§ 4401, *et seq.* and 8 N.Y.C.R.R. Part 200.

27. The New York State Education Department ("NYSED") is the State Educational Agency ("SEA") in New York State pursuant to the IDEA.

28. The Impartial Hearing Order Implementation Unit is located at 65 Court Street, Brooklyn, NY 11201. It is presumptively responsible for the implementation of orders issued by Impartial Hearing Officers.

29. Sapna Kapoor is the Director of the Unit. In that capacity she is presumptively responsible for overseeing the implementation of the orders Defendant DOE receives in the Impartial Hearing Order Implementation Unit office against Defendant DOE on a timely basis. This includes issuing timely payments to vendors and service providers on behalf of Defendant DOE.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over Plaintiffs' federal claims brought under the IDEA, Section 504, the ADA, § 1983; and 42 U.S.C. § 1988, all raising federal questions under 28 U.S.C. § 1331 and under 28 U.S.C. § 1343(a), as claims are raised under the laws protecting civil rights.

31. This Court has pendent jurisdiction over Plaintiffs' state and city law claims pursuant to 28 U.S.C. § 1367(a). Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202.

32. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because Defendant DOE is situated and/or resides in this District.

33. Late Notice of Claim was filed with the New York City Comptroller's Office on August 21, 2019, which is applicable only to Plaintiffs' state and local claims. Plaintiffs allege that with respect to J.V.2, the statute of limitations would be tolled, until he reaches the age of majority, and thus the notice of claim in his case is not applicable; and, with

respect to L.V., her claims are continuing and ongoing and should be treated so as not to be precluded by the statute of limitations or notice of claim period.

## **FRAMEWORK OF THE IDEA**

34. The IDEA guarantees that all eligible children with disabilities, ages three through twenty-one, must be offered a FAPE. 20 U.S.C. §1412(a)(1). A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §1400(d)(1)(A)-(B).

35. A FAPE must: (a) be free; (b) "meet the standards of the State educational agency" (which here, is New York State); (c) "include an appropriate . . . secondary school education in the State involved"; and (d) be provided in conformity with an Individualized Education Program ("IEP"). *See* 20 U.S.C. §1401(9); 20 U.S.C. §1414(d)(2)(A); 8 N.Y.C.R.R. §200.4(e)(1)(ii). In addition, a FAPE must be provided in the Least Restrictive Environment ("LRE"). 20 U.S.C. §1412(a)(5).

36. To be entitled to a FAPE, a child must have one or more of thirteen disabling conditions and, by reason of his/her disability, require "special education" and "related services." 34 C.F.R. §300.8(a)(1).

37. Defendant is responsible for providing a FAPE to all eligible children in New York City and promulgating policies and procedures in accordance with the IDEA.

38. New York State, through The New York State Education Department ("NYSED"), is the guarantor of a FAPE under the IDEA and is responsible for the provision of a FAPE if Defendant DOE is unwilling, or unable, to provide it.

39. The State, through NYSED, is obligated to have policies, procedures, protocols and regulations to ensure every eligible child's right to a FAPE, and protect the due process rights of those children and their parents, in compliance with the IDEA and Section 504.

40. The State is obligated to monitor Defendant's compliance with the IDEA, and to ensure that Defendant maintains adequate policies and procedures under the IDEA.

41. The IEP, which must be individually tailored to each student, is meant to serve as a blueprint for each child's special education services. 20 U.S.C. §1414(d).

42. By the beginning of each school year, Defendant DOE must have an IEP in place that offers a FAPE for each eligible child. 20 U.S.C. §1414(d)(2).

43. Before an IEP can be developed, a child must be evaluated in accordance with the detailed procedures outlined in both federal and state laws. 20 U.S.C. §1414, 34 C.F.R. §§300.15, 300.303- 300.311, 8 N.Y.C.R.R. §200.4. A child is reevaluated in accordance with the same standards at least every three years or earlier, if a parent or school district believes it is necessary.

44. Among other things, an IEP must be developed by a properly constituted IEP team that must consist of particular members, including the parent and a district representative who is knowledgeable about the services and able to commit district resources. 20 U.S.C. §1414(d)(1)(B). In addition to the IEP team, New York State Law has created Committees on Special Education ("CSEs") and Subcommittees on Special Education ("SBSTs") (usually school-based teams), that have differing levels of decision-making power. N.Y. Educ. Law §4410; 8 N.Y.C.R.R. §200.3(a)(1).

45. The IEP team must meet at least annually, and more frequently, if necessary, to modify a child's services and address "[a] lack of expected progress toward the annual goals and in the general education curriculum." 20 U.S.C. §1414(d)(4)(A)(ii)(I).

46. As alleged herein, Defendant's IEP teams are not properly trained on the IDEA's requirements for annual review meetings, do not properly track or benchmark J.V.2's progress, and fail to modify services to address a lack of progress for a child with autism.

47. The IDEA broadly defines the categories of services that must be offered, which include but are not limited to: special education, related services, supplementary aids and services, transition services, assistive technology, and positive behavioral supports and services (collectively "Special Education Services").

48. The IDEA prescribes, in detail, the process for developing IEPs and its contents. 20 U.S.C. §1414(d)(1)(A), (d)(2); 34 C.F.R. §§300.320(a)(2)-(3); 300.324; 8 N.Y.C.R.R. §200.4(d)(2)(iii).

49. For example, all IEPs must contain the results of a child's most recent evaluations, as well as an accurate and consistent description of his/her strengths and present levels of academic achievement and functional performance (called "Present Levels of Performance" or "PLPs"). 20 U.S.C. §1414(d)(1)(A).

50. An IEP must contain "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modification or supports for school personnel that will be provided for the child." 20 U.S.C. §1414(d)(1)(A)(i)(IV).

51. Each IEP must also contain research-based instructional strategies unless they are not feasible, including research-based positive behavioral interventions and supports, 34 C.F.R. §§300.320(a)(4), 300.324(a)(2)(i); 8 N.Y.C.R.R. §§200.4(d)(2)(v)(b), 200.4(d)(3)(i), and "positive behavioral supports" for those children whose behavior impedes their own learning and that of others. 34 C.F.R §300.324(a)(2).

52. An IEP team must consider whether a student would benefit from assistive technology. 34 C.F.R. §§300.5, 300.6, 300.105, 300.324(a)(2)(v).

53. Under the State regulations, Defendant DOE has to provide specific services to children with autism. 8 N.Y.C.R.R. §200.13.

54. All decisions about a child's IEP and placement must be individualized and based upon a child's specific needs. Courts have found that where a district employs blanket policies or practices that set services and delivery by rules or other administrative criteria as opposed to individualized determinations, such policies and practices run afoul of both the IDEA and Section 504, resulting in a denial of FAPE and discrimination. *See Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004).

### OVERVIEW OF IEP-BASED SERVICES FOR CHILDREN WITH AUTISM

55. Autism is one of the thirteen disabling conditions entitling a child to Special Education Services under the IDEA. 20 U.C.S. §1401(3)(A)(i); 34 C.F.R. §300.8(c)(1). Autism is defined under the IDEA as:

> A developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

34 C.F.R. §300.8(c)(1).

56. While classification is not necessarily the same as a diagnosis, presumably, no child should be classified as autistic unless they have a diagnosis. In New York, many children who are diagnosed with ASD under the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") (and its precursor) are also generally classified by Defendant DOE as autistic. However, some children diagnosed with an ASD may not be classified as autistic on their IEPs.

57. The number of school-aged children classified with autism under the IDEA in New York State has grown significantly over the years.

58. According to statistics posted on NYSED's website, there were 449,688 children ages 4-21 classified with disabilities cross New York State as of October 2014. Out of those children, 211,275 (approximately 54%) were in New York City.

59. In the 1995-1996 school year, there were approximately 346,305 children ages 5-21 classified with disabilities in New York State; out of that group, 3,113 were classified with autism. By the 2001-2002 school year, the number of children in New York City classified as autistic grew to 7,023.

60. According to NYSED's statistics from the 2007-2008 school year, there were 6,526 children ages 4-21 classified with autism in New York City. By the 2010-2011 school year, that number grew to 8,886.

61. According to statistics posted on NYSED's website, by October 2014 there were approximately 13,194 children ages 4-21 classified with autism in New York City.

62. Despite the rapid growth in children who qualify for Special Education Services, Defendant DOE's Special Education Services and Programs have not expanded or evolved to keep up with the growing number and diversity of needs of the ASD

population, nor the latest research on interventions. Further, very few students with ASD are educated in the LRE.

63. Instead, Defendant relies primarily on a one-size-fits-most approach when it comes to serving children with ASD.

64. Under IDEA, each SEA and LEA (here, Defendant DOE) must adopt a "continuum of alternative placements" ("continuum") that must include, *inter alia*, regular classes, special classes, special schools, and instruction at home. 34 C.F.R. §300.

65. In 2001, Defendant DOE implemented the following "New Continuum" for school-aged students with disabilities, offering the following categories of placements, ranging from the "least" to the "most" restrictive environments (*i.e.*, segregated from typical peers) for students with special needs:

   a. General education in a community school (*i.e.*, a regular neighborhood public school);

   b. General education with related services (such as speech therapy, occupational therapy, etc.);

   c. General education with "special education teacher support" ("SETS") (formerly "resource room");

   d. Collaborative Team Teaching ("CTT") in a community school;

   e. Special education class in a community school;

   f. Special education class in a "specialized school" in District 75;

   g. State-Approved Private Day programs ("NPS");

   h. State-Approved Private Residential program; and

   i. Home and Hospital Instruction.

66. Prior to the implementation of the New Continuum, Defendant placed students with disabilities based upon their disability categories. One of the stated goals of the New Continuum was to end this practice. However, children with the most severe disabilities, like Plaintiff J.V.2, are still generally placed by his disability category by Defendant DOE's IEP teams and pursuant to NYSED's policies.

67. Since 2001, Defendant DOE has reorganized the special education service delivery system several times and a new reform was implemented in the past two years.

68. Through all of these reorganizations, Defendant DOE has maintained their separate, citywide, segregated, special education district called District 75. According to Defendant DOE's website: "District 75 provides citywide educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensory impaired and/or multiply disabled."

69. The Defendant DOE's statistics show that, as of 2008, four classifications comprised 87% of the 20,125 classified students enrolled in school-based District 75 programs: "emotional disturbance," "autism," "intellectually disabled" and "multiple disabilities."

70. District 75 offers a limited "menu" of classes and programs in which children are generally placed by their classification:

   a. 6:1:1 classes are for autistic children; 6:1:1 ratio means six children, one teacher, and one paraprofessional.

   b. 12:1:4 classes are for children classified as "multiply handicapped";

   c. 8:1:1 classes may be for children who are intellectually disabled, autistic, or "emotionally disturbed"; and

    d.  12:1:1 classes are for children who are intellectually disabled and emotionally disturbed.

71. Statistics show that in 2013 at least 51.1 % of the children classified as autistic were recommended for 6:1:1 programs.

72. Over the past ten years, the Defendant DOE has slowly developed a small number of specialized programs for children with ASD who are high functioning and have limited, or no, behavioral issues.

73. According to Defendant DOE's website: "[t]he ASD Nest program is a program for high functioning students [ASDs] that takes place in an integrated co-teaching class in a community school." Similarly, Defendant's website notes that "[t]he ASD Horizon program is offered primarily in self-contained classes in community schools to students with [ASDs] who work well in a class that has a ratio of eight students and two adults. This program is the result of a collaboration with the New England Center for Children."

74. There are very few available seats in the Horizon and ASD Nest programs, compared to the number of children who would benefit from being in these types of programs. Recently, however, Defendant DOE has announced a plan to expand those programs.

75. IEP teams cannot generally make recommendations for ASD Nest or Horizon; these programs have discretion to accept or reject applicants based upon a screening of students' IQ, behavior, and other factors. Defendant DOE also has a small program called "District 75 inclusion," which is a model of one paraprofessional matched with two or three students in a regular community school program. A typical IEP team cannot recommend this type of program; children must already be attending a District 75 segregated setting before they can be placed in a District 75 inclusion program.

76. Defendant DOE has only limited options on its public school program "menu" for autistic children who are considered to be significantly impaired and/or who require intensive behavioral and instructional support to learn, generalize, or be included as all or part of the day with typical peers.

77. The 6:1:1 program in District 75 is the only public school option for most school-age children with ASD in New York City. The 6:1:1 programs are generally fully segregated programs for autistic students. There is little to no social interaction with typical peers.

78. If a child needs a more intensive ratio or additional services, Defendant DOE's IEP teams have only one option: to add a "health paraprofessional" or "crisis management paraprofessional" ("Paraprofessionals") to the child's IEP.

79. The Paraprofessionals in the City's schools are not properly trained to work with children with ASDs, are only required to hold a high school diploma, and can start working in Defendant DOE's schools after taking a brief set of online classes and passing a minimum competency test.

80. In some community districts, all children with autism attending public programs are in District 75.

81. Defendant DOE's IEP teams are constrained by what is available on Defendant DOE's limited menu of services, or at particular schools, and make program and placement decisions based upon what is available, not the individual needs of the child.

82. Thus, Defendant DOE illegally stripped IEP teams of their authority under the IDEA and have restricted their ability to make individualized decisions about Special Education Services.

83. Defendant DOE regularly applies blanket policies, procedures, and practices to the formulation of IEPs and placement recommendations for children with autism without regard for student need. In essence, Defendant DOE restricts the ability of IEP Teams to recommend Autism Services (defined below) on an autistic child's IEP ("Autism Services Policies and Practices").

84. In general, without a due process hearing, IEP teams cannot (and do not) recommend any of the following services on IEPs for children with autism: (a) 1:1 instruction with a teacher for all or part of the day; (b) research-based instructional strategies, including, but not limited to, Applied Behavioral Analysis ("ABA"); (c) extended school day, after school or home-based services (for students attending a school-day program); (d) parent training at home; (e) services to promote inclusion; (f) training for staff; (g) rehabilitation training; (h) leisure training; or (n) instruction in a ratio smaller than 6:1:1 for students in a public school (collectively "Autism Services").

85. Defendant DOE does not actually offer ASD students the full range of educational services, supports, and accommodations that are contemplated by the IDEA.

86. For example, generally, Defendant DOE's IEP teams are not allowed to make "dual" recommendations for home-based or after school services if a child is already attending a school day program.

87. Students requiring Autism Services or any other individualized modifications must seek those services through administrative litigation.

88. Defendant DOE applies these blanket policies and practices even to plaintiffs who have obtained Autism Services through litigation.

89. Each year, parents who previously won or settled for Autism Services for their children must engage in litigation again to keep those services. At the end of each school year, on July 1st, Defendant refuses to provide Autism Services.

90. Each year, plaintiffs who have won or settled for Autism Services are forced to attend an illegal, pretextual IEP meeting at which the team members are constrained by the above-referenced blanket policies and practices.

91. At these meetings, Defendant DOE generally terminates and/or denies Autism Services for the upcoming year, regardless of whether the child made progress in the prior year, or requires the Autism Services to obtain an educational benefit.

92. Defendant's policies and practices are such that they do not believe they are bound by the decision of an Independent Hearing Officer ("IHO"), or even a court, with respect to any school year other than the one that was litigated.

93. Given Defendant's blanket policies, parents can never escape the litigation merry-go-round and are in a constant state of litigation.

94. Further, when children with any 1:1 teacher support services or after school services reach the age of five and transition to Defendant DOE's school-age programs, Defendant DOE automatically terminates those services on the IEPs. Previously, these children could hold over these services through litigation.

95. Historically, 1:1 teacher services using ABA were available to students in Defendant's preschool programs.

96. Defendant DOE has also directed its preschool staff to stop recommending dual programs (*i.e.*, after school 1:1 services) to preschool age children.

97. Accordingly, Defendant's IEP teams do not possess the power to consider reasonable accommodations for children with ASDs or to apply Section 504 to IEP recommendations or placements.

## PROCEDURAL DUE PROCESS REQUIREMENTS

98. The State and Defendant DOE are required to establish and maintain procedures in accordance with the IDEA to "ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]." 20 U.S.C. §1415(a).

99. The IDEA affords parents the right to "examine all records" related to their child and to "participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a [FAPE] to such child, and to obtain an independent educational evaluation of the child." 20 U.S.C. §1415(b)(1); 34 C.F.R. §300.501(a)-(b).

100. Districts must "take whatever action is necessary to ensure that the [parent] understand[s]" IEP meeting proceedings. 34 C.F.R. §300.322(e); 8 N.Y.C.R.R. §200.5(d).

101. Parents must be provided with Prior Written Notice ("PWN") whenever a district "proposes to initiate or change" or "refuses to initiate or change" the "identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to the child." 20 USC §1415(b)(3). The exact contents of PWN is prescribed by the IDEA; in general, it must be individualized and advise parents of the district's decisions and actions and reasons behind them. 20 U.S.C. §1415(c); 34 C.F.R. §300.503(c).

102.     Prior to any evaluation or reevaluation, a district must obtain "informed parental consent." 20 U.S.C. §1414(c)(3).

103.     Districts must also provide Procedural Safeguard Notices ("Safeguards") to parents. 20 U.S.C. §1415(d). As of 2004, such Safeguards must be written in a manner that is "understandable to the general public" (34 C.F.R. §300.504; 34 C.F.R. §300.503(c)) and must "include a full explanation of the [IDEA's] procedural safeguards." 20 U.S.C. §1415(d)(2).

**Defendant's Due Process Hearings and Appeals Are Not IDEA Compliant**

104.     One of the IDEA's most well-known due process rights is the right to request an impartial hearing "with respect to any matter relating to the identification, evaluation, or educational placement of [a] child" or the provision of FAPE to a child. 20 U.S.C. §1415(b)(6)(A).

105.     Thereafter, a parent "shall have an opportunity for an impartial due process hearing, which shall be conducted by the [SEA] or by the [LEA] as determined by State law or by the [SEA]." 20 U.S.C. §1415(f)(1)(A)

106.     The IDEA sets forth detailed requirements for hearing procedures and IHO qualifications. 20 U.S.C. §1415(f); 34 C.F.R. §§300.511-516.

107.     Among other things, an IHO shall not be an employee of the SEA or the LEA and cannot have a personal or professional interest that conflicts with the IHO's objectivity. 20 U.S.C. §1415(f)(3)(A).

108.     IHOs must also be knowledgeable about the applicable laws, be able to preside over hearings, and write decisions in a manner consistent with generally acceptable legal standards. *Id.*

109.    In 2004, the standard for an IHO's decision-making was amended to require a decision on "substantive grounds based on a determination of whether the child received" a FAPE. 20 U.S.C. §1415(f)(3)(E)(i). Further, "[i]n matters alleging a procedural violation" an IHO may find that a child did not receive a FAPE "if the procedural inadequacies – impeded the child's right" to a FAPE; "significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of" a FAPE, or "caused a deprivation of educational benefits." 20 U.S.C. §1415(f)(3)(E)(ii)(I-III).

110.    In a two-tiered administrative system, "any party aggrieved by the findings and decision rendered [by the LEA] may appeal such findings and decision to the [SEA]." 20 U.S.C. §1415(g)(1). The SEA "shall conduct an impartial review of the findings and decision appealed." 20 U.S.C. §1415(g)(2).

111.    New York is one of only a handful of remaining states that employ the above referenced two-tiered due process system.

112.    In New York City, Defendant DOE is responsible for ensuring that impartial hearings comport with the IDEA's requirements and appeals from IHOs' decisions are heard by a State Review Officer ("SRO"), an employee of and lawyer for New York State. See N.Y. Educ. Law §4404.

113.    Although the language of the IDEA suggests that the SEA is the reviewing party, several federal courts have held that the SRO cannot be an employee of the SEA.

114.    The IDEA itself does not set a timeline for completion of administrative proceedings; however, federal regulations state that a decision should be issued within 45

days following a 30-day resolution period. 34 C.F.R. §300.515(c). An SRO decision must

be issued within 30 days.

115.     However, under federal law, an IHO or SRO can grant extensions of time at the

request of either party. 34 C.F.R. §300.515(c).

116.     Defendant DOE fails to fund pending services prospectively without an order

from an IHO, which disadvantages families that cannot afford to pay for their child's

services up front and request reimbursements.

117.     Neither IHOs nor SROs have power to alter Defendant's policies or general

practices and cannot issue prospective relief.

118.     Defendant have promulgated various regulations and policies, and engaged in

practices with respect to due process that violate the IDEA and impermissibly restrict

IHO discretion and qualifications.

**Defendant's Policies and Practices with Regard to Students' Pendency Rights Violate the IDEA**

119.     The IDEA requires that a child "stay put" in his or her last agreed upon-placement

when a Due Process Complaint ("DPC") is filed. 20 U.S.C. §1415(j).

120.     A student's "stay-put" rights ("pendency") can be changed by agreement between

the parties, or by a final, unappealed order of an IHO, SRO, or court.

121.     Pendency rights are supposed to be automatic and unconditional; they attach

when a parent files for due process.

122.     Defendant DOE does not have policies and procedures in place to ensure that

students' pendency rights are timely implemented such that the intended purpose of

pendency is served.

123.     With limited exceptions, Defendant DOE requires parents to request and obtain pendency orders from IHOs in order for pendency to be implemented.

124.     However, Defendant DOE does not have policies and procedures in place to ensure that pendency hearings, dates, and orders can be obtained quickly and efficiently. Moreover, there is no consistency in the way pendency hearings are conducted.

125.     Some IHOs allow for expedited pendency procedures such that the parties can agree to pendency terms via e-mail or a short phone call, while others require a full pendency hearing on the record including the submission of evidence and, in some cases, testimony. Similarly, some of Defendant DOE's districts are prohibited from agreeing to pendency terms on the record, even when there is no substantive dispute.

126.     Further, it is Defendant's position that they will not fund services in advance or enter into binding contracts with private pendency providers and certain schools that are not state-approved.

127.      At the same time, many private pendency providers and schools will often not continue to allow enrollment or provide services until funding is secured (i.e., until an enforceable pendency order is obtained). If they do choose to continue to serve the child, they do so at their own risk as they have no contract with Defendant or the parents.

128.     As a result, while wealthy parents might be able to front the costs of their child's pendency services or placement and await reimbursement, parents without money and/or resources are often forced to allow their child's services to lapse.

**Defendant Continues to Apply Blanket Policies Even to Parents Who Win Hearings**

129.     Defendant refuses to accept the rulings of IHOs when it comes to awards of Autism Services.

130.     An unappealed, impartial hearing order can establish a students' last agreed-upon placement in the same manner as an uncontested IEP. Yet, Defendant treats the two differently.

131.     In general, when a parent agrees to the services offered in an IEP and the IEP is implemented, Defendant provides the student with the prescribed services and, at the next annual review, will consider whether those services should continue.

132.     In contrast, when students' last agreed-upon placement and services are established, via an unappealed order, or resolution agreement for Autism Services, Defendant DOE's IEP teams ignore the hearing order and/or agreement at subsequent IEP meetings. Instead, at the start of the next school year, they will revert back to the program offered on the last IEP, regardless of whether one or more IHOs found that program inappropriate.

133.     Defendant DOE's IEP teams do not acknowledge unappealed orders as having the same legal effect as uncontested IEPs, although they are supposed to confer the same rights upon children with disabilities and their parents.

134.     As a result, as alleged above, parents are forced into litigation year after year to fight for the services their children require.

**FACTUAL ALLEGATIONS IN SUPPORT OF PLAINTIFFS' CLAIMS**

135.     J.V.2 is a four-year-old boy with autism.

136.     ~~Defendant has misclassified J.V.2 and have~~Defendant has misclassified J.V.2 and has failed to timely and fully reevaluate him.

137.     As defined pursuant to the ADA and Section 504, J.V.2 has one or more physical

and mental impairments that substantially limit one or more of his major life activities,

including but not limited to his ability to learn.

138.     His various disabilities impact his ability to progress in his cognitive,

developmental, academic, and his functional areas. He exhibits delays in his social-

emotional, behavioral, language, speech, communication, and sensory functioning.

**J.V.2's Early Intervention and IFSP Meetings**

139.     Because of various concerns regarding J.V.'s development, in April 2017 when

J.V.2 was two years old, L.V. requested an evaluation by the Early Intervention Program

("EI"). The "Early Intervention" Program is a federally funded program administered by

the New York State Department of Health for children zero to two years of age with

identified developmental delays. *See generally* 20 U.S.C. §§ 1431 *et seq.*; N.Y. Pub.

Health Law §§ 2540 *et seq.*

140.     Effective July 19, 2017, J.V.2 was found eligible for EI services, including

applied behavior analysis ("ABA")[1] therapy services, as well as related services of

occupational therapy, speech and language therapy, and physical therapy. Significantly,

J.V.2's psychological evaluator, as part of her conclusions, recommended that his

---

[1] ABA is defined by state law to mean "the design, implementation, and evaluation of
environmental modifications, using behavioral stimuli and consequences, to produce socially
significant improvement in human behavior, including the use of direct observation,
measurement, and functional analysis of the relationship between environment and behavior."
N.Y. Educ. Law § 8801.

Committee on Preschool Special Education ("CPSE") evaluations should be completed before his third birthday to prevent interruption of services. Despite this recommendation and L.V.'s desperate pleas to Defendant to continue J.V.2's services so that he would receive necessary therapy, continue to progress, and not regress, J.V.2's services were interrupted as further described herein.

141.     From September 5, 2017 through January 31, 2018, J.V.2 received ABA therapy.

142.     On October 10, 2017, J.V.2 was authorized to receive ABA instruction totaling 20 hours: 10 in-home and 10 in a community-based setting. Thereafter, J.V.2 began receiving 6 hours per week of in-home ABA therapy.

**The CPSE November 20, 2017 IEP Meeting**

143.     On November 20, 2017 the Committee on Preschool Special Education ("CPSE") held an initial IEP meeting for J.V.2 with the following individuals present: L.V., J.V.2's ABA Teacher from EI, a DOE administrator, a teacher, and a social worker.

144.     J.V.2's November 2017 IEP recommended a self-contained preschool special class of 8:1+2, which means eight students per one teacher plus two paraprofessional teacher's aides, for 12-months, along with individual speech and language therapy ("SLT") 5x30x1  (five times per week for thirty minutes per session), individual occupational therapy ("OT") 3x30x1 (three times per week for thirty minutes per session), individual physical therapy ("PT") 3x30x1 (three times per week for thirty minutes per session), as well as specialized transportation. The CPSE rejected an

integrated program as insufficient to meet J.V.2's needs.[2] These services were expected to begin on September 1, 2018.

145.     Although the CPSE conducted a brief observation of J.V.2 and a social history interview with L.V., it did not conduct any new evaluations of J.V.2 for purposes of the IEP meeting. None of J.V.2's actual EI evaluators participated in the IEP meeting. The EI reports that were provided at the IEP meeting were deficient because, among other issues, the reports significantly underestimated J.V.2's cognitive functioning.

146.     Defendant DOE failed to provide L.V. with PWN.

147.     Defendant DOE failed to provide L.V. with a copy of the November 2017 IEP until February 2019.[3]

148.     Based on the November 2017 IEP for the 2017-18 school year, Defendant DOE: (a) failed to timely, thoroughly, and appropriately evaluate J.V.2; (b) failed to develop a substantive and procedurally valid IEP; (c) failed to provide a timely and appropriate placement; (d) failed to employ appropriate evaluation(s), IEP development, and placement procedures; (e) violated L.V.'s procedural rights under the IDEA resulting in L.V.'s exclusion from the special education process; and (f) failed to implement J.V.2's educational and related services.

---

[2] An "integrated program" is one that combines general education students with special education students in a general educational setting.

[3] Because Defendant DOE denied Plaintiff L.V. a copy of J.V.2's IEP, L.V. was unable to effectively advocate for her own due process rights or J.V.2's service needs or disability rights. Further, she was unable to file a due process complaint. As a result, Defendant was able take to unlawful advantage of Plaintiff L.V.'s ignorance of her legal rights and remedies. For example, the January 2018 Interim Order on Pendency failed to include ABA services, which J.V.2 arguably was entitled to and required, given his mandated ABA services during EI. Once Defendant DOE provided the November 2017 IEP to L.V., and its contents became known, and once L.V. had counsel, ABA services were sought and obtained for J.V.2.

**The CPSE December 7, 2017 IEP Meeting**

149.     On December 7, 2017, the CPSE reconvened to unilaterally change its previously

recommended IEP for J.V.2 allegedly because there was no preschool with an appropriate

seat available consistent with the CPSE's prior recommendations.

150.     At the December 7, 2017 meeting, only L.V., a CPSE administrator, and a special

education teacher were in attendance. At the meeting, the CPSE arbitrarily and

unilaterally reduced J.V.2's services. The CPSE recommended that J.V.2 receive a

Special Education Itinerant Teacher ("SEIT") for the 2018-19 school year, reducing

J.V.2's services from twenty sessions of ABA services for sixty minutes per week to ten

sessions of SEIT services per week for sixty minutes each, along with SLT (five times

per week for thirty minutes per session), OT (three times per week for forty-five minutes

per session), and PT (three times per week for forty-five minutes per session), on a 12-

month basis with specialized transportation.

151.     The reduction in J.V.2's services in his December 7, 2017 IEP had an

implementation date of September 1, 2018 based on the presumption that J.V.2's EI

services would continue until that time.

152.     Defendant DOE failed to provide J.V.2 with a FAPE for the 2017-2018 school

year.

153.     Defendant DOE failed to provide L.V. with the "December 2017 IEP" until

approximately six months after the December 2017 IEP meeting *i.e.* in or about June

2018.

154.     Defendant DOE failed to provide L.V. with PWN for the December 2017 CPSE

meeting. Instead, the CPSE provided L.V. with a document called a "Final Notice of

27

Recommendation" ("FNR"). The FNR did not include the legally mandated information

that the IDEA required for a PWN.  The FNR also failed to include an implementation

date for the IEPs recommended services.

**Early 2018**

155.     On January 10, 2018 and January 22, 2018 two incidents in L.V.'s home

involving J.V.1 caused J.V.2's ABA therapy services to be terminated effective February

1, 2017. The ABA service providers falsely claimed that J.V.1 was substantially

interfering with the provision of ABA therapy services to J.V.2.

156.     A decision was made to end J.V.2's EI provider's services in L.V.'s home as of

February 1, 2018. The ABA service provider stated that services could continue to be

offered in a community-based setting.

157.     L.V. challenged *pro se* the decision to terminate J.V.2's home-based ABA

therapy in an administrative proceeding but was unsuccessful. The administrative law

judge affirmed the CPSE's decision to offer J.V.2 ABA therapy in a community-based

setting.

158.     When J.V.2 was transitioning from EI to CPSE, Defendant DOE applied its

systemic, widespread, illegal policy, and automatically terminated J.V.2's ABA services

that were recommended on J.V.2's Individualized Education Services Plan ("IESP") in

anticipation of his transition from EI to CPSE.

159.     Defendant DOE's illegal policy is to automatically terminate ABA services as

children transition from EI to CPSE rather than continue the recommendation of ABA

services that children's respective IESPs' recommend. Defendant DOE's systemic,

widespread, illegal policy is applied to all preschool children, without regard to any

particular child's progress or needs, or to any individualized child's educational, social, learning, or disability considerations.

160.    Defendant DOE failed to reevaluate J.V.2 relative to his receipt of ABA services as it was required to do pursuant to the citywide policy prior to the termination of or any substantial change in placement.

161.    L.V. repeatedly emailed the CPSE and pleaded with Defendant to continue his services and to have the CPSE begin implementing J.V.2's IEP mandated services and/or begin alternative services. The CPSE failed to do anything. According to the DOH, J.V.2's EI services had not been provided in full because the DOH allegedly lacked service providers. And according to the CPSE, the DOE lacked service providers to have their services commence.

162.    The CPSE then indicated that it would accommodate L.V.'s request but would need to reconvene to change J.V.2's December IEP. The CPSE, however, took no action until three months later in or about June 2018.


**The CPSE June 5, 2018 IEP Meeting**

163.    On June 5, 2018, the CPSE reconvened briefly with only L.V., a CPSE administrator, and a special education teacher in attendance. The June IEP for the first time provided for a SEIT (5x120).

164.    The CPSE changed the projected date for preschool services implementation from September 1, 2018 to July 1, 2018. J.V.2's June 2018 IEP was otherwise identical to the December 2017 IEP.

165.     Again, Defendant DOE failed to provide L.V. with a PWN for the June 2018 IEP
meeting.

166.     Further, all of J.V.2's 2017 and 2018 IEPs failed to recommend 1:1 ABA services
or parent training.

167.     The November 2017 IEP's description of J.V.2's "current performance and goals"
was repeated verbatim in the subsequent December 2017 and June 2018 IEPs, which
reflects that neither CPSE engaged in the mandated process of considering J.V.2's then
"current" circumstances and that the CPSE failed to establish goals for J.V.2 that
reflected his then current circumstances.

**Due Process Complaint and Amended Due Process Complaint**

168.     On June 6, 2018, L.V. filed a DPC; on October 9, 2018, L.V. filed an Amended
Due Process Complaint ("ADPC"). Both complaints were designated as Case No. 173606
by Defendant Impartial Hearing Office.

169.     Among the relief L.V. requested in both the DPC and ADPC was for the CPSE to
immediately implement services for J.V.2.

170.     Defendant DOE failed to respond to either the DPC or ADPC, failed to conduct a
timely resolution meeting, and–most incredibly–refused to implement the 2018 IEPs
developed by its CPSE without a pendency order from an Independent Hearing Officer.
Defendant would not agree to implement the IEP, even after the amended IEP's July 1,
2018 implementation date.

171.     Therefore, J.V.2 remained without special education services.

**The Interim Order on Pendency for the 2018-2019 School Year**

172.     On July 25, 2018, an Interim Order on Pendency was issued by IHO Jeffrey J. Schiro, Esq. to Defendant DOE for J.V.2 for the 2018-19 school year to effectuate the December 7, 2017 IEP, effective from June 6, 2018 (the date the Due Process Complaint was filed) until the conclusion of the administrative proceedings.[4] Defendant DOE was also to conduct a Functional Behavior Analysis of J.V.2 as well. The DOE did not appeal.

173.     By November 2018, J.V.2's functioning and behavior had significantly regressed because he had not received consistent services between the November 2017 IEP meeting and the June 2018 IEP meeting.

**Attempts at Providing Services for J.V.2**

174.     In October and November 2018, Bridge Kids New York conducted a Function Behavioral Assessment ("FBA") for J.V.2. The FBA report recommended, among other things: a Behavioral Intervention Plan ("BIP"), 1:1 ABA, Board Certified Behavioral Analyst ("BCBA")/Licensed Behavior Analyst ("LBA") supervision, parent training, and a neuropsychological evaluation.

175.     In the fall of 2018, J.V.2 started receiving SEIT services along with OT, PT, and SLT services from Sensory Freeway, a DOE-approved service provider.

176.     In November 2018, however, Sensory Freeway advised L.V. that it could no longer provide services to J.V.2 because one of the individuals providing services to J.V.2, who worked for Sensory Freeway at L.V.'s home, alleged that she was unable to

---

[4] IHO Schiro became the Impartial Hearing Officer after several IHOs recused themselves. "Recusal," as part of the administrative hearing process, is typically not for reasons of personal or professional conflicts of interest; rather, "recusal" may simply occur because of a scheduling conflict by a particular IHO. Another systemic issue plaguing the special education system in New York City is the paucity of IHOs; the current number of IHOs is insufficient to meet the demand for due process hearings requested.

"handle" the alleged behavior of J.V.1, J.V.2's sister. J.V.1 also has been denied a FAPE and has been out of school since December 2017.

177.    Coincidentally, J.V.2's SEIT resigned around the same time.

178.    J.V.2 has been out of school without services in violation of his pendency orders from November 2018 to present.

179.    From November 2018 to present, L.V. made herculean efforts to try to obtain services by: sending daily emails to Defendant requesting assistance; making scores of phone calls to potential providers; conducting internet searches; and making multiple inquiries looking for service providers on Staten Island and in the nearby areas. She was unable to find any service providers who would come to her home and/or that could provide center-based support within the hours L.V. had available considering the service requirements of her other child, J.V.1.

180.    Further, as the initial pendency order did not contain transportation services and because J.V.1 was also out of school, L.V. faced particular difficulties. She was unable to be in two places at one time, and both of her children require services at the same time.

181.    As a result of Defendant's actions and failures to act, L.V. suffered substantially as she was unable to pursue education, job and/or income opportunities as she had to focus all of her time on providing mandated and related services for her children.

182.    As a result of Defendant's actions and failures to act, L.V. suffered and is suffering from emotional anxiety and emotional distress, which affects her quality of life and her pursuit of happiness, which are basic human rights.

183.    Therefore, L.V. was and is unable to obtain employment or education due to spending all of her waking hours on providing full time care for her children and making

numerous calls, sending dozens of emails, and engaging in every opportunity possible to obtain her children's required services.

184.     As a result of Defendant's actions, Plaintiffs suffered and are suffering the deprivation of their constitutional due process rights.

185.     Due to her inability to pursue her own career goals, Defendant deprived L.V. of not only income, but also valuable experience that she could have used to further promote her own career.

186.     In January 2019, Defendant eventually agreed to fund tutoring services for J.V.1 at Lindamood Bell, a service provider in Brooklyn. Defendant was supposed to fund a transportation aide. However, there was a refusal by Sapna Kapoor to implement the required aide. As a result, L.V. had no choice but to take J.V.2 with her to Lindamood Bell and wait with him in Brooklyn for several hours while J.V.1 received her services before returning home.

187.     Further, Sapna Kapoor refused to authorize funds for transportation for L.V. and J.V.1's services. As a result, L.V. and her children spent over four hours on public transportation, a significantly distressful experiences for J.V.2 and J.V. 1 because of their special needs disabilities.

**The January 25, 2019 NYSED Complaint**

188.     On January 25, 2019, L.V. filed a complaint with NYSED's special education quality assurance regional office asserting inter alia Defendant DOE's failure to comply with the pendency order issued by the IHO dated July 25, 2018 (but effective as of June 6, 2018).

189.     On February 27, 2019 and March 1, 2019, L.V. wrote to the DOE advising that she disagreed with Defendant DOE's most recent evaluations and requested a neuropsychological assessment. However, to date, Defendant DOE has not agreed to fund the assessment.

**The NYSED's Office of Special Education's Findings of January 25, 2019 State Complaint**

190.     NYSED's Office of Special Education found that Defendant failed to provide J.V.2's mandated services in a timely or consistent manner.

191.     On March 26, 2019, NYSED's Office of Special Education ordered that by April 26, 2019, the CSE must provide to the NYSED the number of missed sessions of SEIT, OT, PT, and ST, a list of providers for the above mentioned services, and a make-up schedule for the missed sessions of the above listed services.

192.     Further, NYSED ordered that by May 31, 2019, the CSE must provide evidence to NYSED that J.V.2 has received such services from April 1-May 24, 2019, and has made up the missed sessions during May 6-24, 2019, along with DOE's provision of administrative procedures and a list of individuals who will enforce them, thereby ensuring J.V.2 continues to receive the mandated services.

**Retaliatory Call to ACS Against L.V.**

193.     On March 11, 2019 after 11 p.m., despite the pending state complaint to NYSED and the pending request for the IHO to fund McCarton, ACS made an "emergency" visit to Plaintiffs' home. ACS advised L.V. that it had received an emergency call asserting that L.V. was not cooperating with DOE's efforts to arrange, *inter alia*, home-based speech and OT service providers that the DOE had made available.

194.     L.V. asserts upon information and belief that the DOE's call to ACS was made to retaliate against her for asserting her rights to have the pendency order enforced against Defendant DOE.

195.     Consequently, until the ACS case was deemed unfounded, L.V. had an open ACS case. L.V. suffered as a result extreme distress and embarrassment, mortification, sleeplessness, and anxiety.

196.     Upon information and belief, Defendant DOE uses ACS as a weapon against parents by either threatening to call them and/or actually calling them and lodging false complaints of alleged educational neglect against parents to harass them, like it did in L.V.'s case.

197.     Further, because the DOE's allegations against L.V. were based not on educational neglect but upon special education related services, they were per se violative of law, in addition to being false, misleading, and retaliatory.

198.     The DOE not only acted in retaliation, but acted maliciously because it was aware that the allegations were false and misleading, and were designed solely to harass and retaliate against L.V. because she asserted her parental rights against the DOE.

**The Interim Order Modifying Pendency Order**

199.     Eventually, L.V. identified the McCarton Center as an available program to deliver ABA services, and related services of OT, PT and SLT for J.V.2. However, the McCarton Center would only agree to accept J.V.2 if the DOE provided funding every thirty days in advance.

200.     On February 28, 2019, a hearing date was held in Case No. 173606 requesting funding for the McCarton Center and seeking an order directing Defendant to fund the

compensatory services. At the hearing, the DOE did not assert that it had alternate service providers available for J.V.2. The DOE did not object to funding the McCarton Center.

201.     On March 12, 2019 the IHO issued an Interim Order Modifying Pendency Order and directed Defendant DOE to provide 1:1 ABA services at McCarton, a service provider, with OT, SLT, and PT, as well as to provide specialized transportation services with a qualified transportation aide. *See* Exhibit 2. The Modifying Order also directed Defendant DOE to fund J.V.2's compensatory pendency services at McCarton.

202.     Further, door-to-door transportation between Plaintiffs' home and the McCarton Center was required. J.V.2 started to receive some of his "stay-put" services at McCarton the week of April 8, 2019. He attended McCarton until spring break which started on April 19, 2019.

203.     However, Defendant did not timely or appropriately staff the travel aide or provide physical therapy. Also, Defendant did not identify a properly qualified aide to take J.V.2 to and from the program.

204.     On May 17, 2019 McCarton advised L.V. that it would no longer be able to provide services to J.V.2.

205.     On May 20, 2019 L.V.'s then counsel advised Defendant that they would need to locate alternative providers. To date, they have failed to do so despite repeated entreaties by L.V.

**The CPSE IEPs have the following substantive and procedural deficiencies**

206.     Overall, the DOE's IEP development process, resulting IEPs, programs, and placements for J.V.2 during all of the school years that  J.V.2 has received educational

services from Defendant (the 2017-2019 school years) was substantively and procedurally flawed for reasons including, but not limited to, the following:

    a.   Defendant failed to employ proper procedures to schedule and notify Plaintiffs about meetings;

    b.   Plaintiffs were not provided with documents including meeting notices, IEPs, evaluations, reports, waivers, and notices of their rights consistent with the law regarding J.V.2's education;

    c.   Defendant failed to make decisions about J.V.2 based upon his individual needs;

    d.   Defendant made decisions about J.V.2's IEP and placement based on blanket policies, administrative considerations, and resources and predetermined outcomes of the meeting;

    e.   For all of the school years in question, Defendant failed to conduct legally adequate evaluations and reevaluations upon which to base its IEPs for J.V.2;

    f.   Defendant never provided Plaintiffs with legally sufficient Safeguards and PWN as defined under the IDEA, throughout the years in question;

    g.   The IEP teams were not duly constituted and did not have required members; even where certain individuals were present in name/title, they did not possess the required knowledge, training, and independence to formulate a legally valid IEP;

    h.   The members of the IEP teams were not vested with sufficient authority and autonomy to perform their mandated duties with respect to J.V.2;

    i.   The IEPs were drafted before or after the meetings;

j.  The IEPs did not adequately describe J.V.2's strengths, weaknesses, abilities, progress, academic and functional levels, the ways his disability impacted him in and out of the classroom, and they contain conflicting information;

k.  The IEPs failed to contain information about J.V.2's most recent evaluations or adequate present levels of performance;

l.  The IEPs failed to include peer-reviewed, research-based instructional strategies, although such methods were feasible and J.V.2 required them;

m.  The goals of all of the IEPs were insufficient; they were not measurable or individually tailored to J.V.2's needs and failed to sufficiently address the ways in which his disability impacts his academic, social-emotional, and behavioral functioning as well as his ability to engage in ADL tasks, communicate, and participate in appropriate leisure activities;

n.  The IEP goals and special education services in each of the IEPs failed to address J.V.2's lack of progress each year;

o.  Defendant has not conducted FBAs or developed Behavior Intervention Plans ("BIPs") in accordance with the law;

p.  Defendant failed to consider or recommend appropriate AT for J.V.2;

q.  The IEPs did not recommend special education services and supports that were adequate to address J.V.2's areas of weakness and significant delays;

r.  The IEPs did not contain services that were adequate to address J.V.2's behaviors, including positive behavioral supports;

s.  J.V.2's related services were inappropriate and insufficient;

t.   For most years, the IEPs did not include parent training as a related service and, upon information and belief, the IEP teams did not consider or discuss parent training as a related service;

u.   Despite the fact that J.V.2 exhibited significant deficits in his ability to generalize skills and information across environments, the Defendant did not consider or recommend after school/home-based services for J.V.2;

v.   Overall, the IEPs, programs, and placements have not included appropriate services and/or goals for J.V.2 to address generalization, his lack of awareness of danger, and ADL;

w.   The IEPs have not offered any 1:1 instruction for J.V.2;

x.   The IEPs did not include sufficient ABA;

y.   The evaluation, IEP development, and placement processes have not met the standards for providing a FAPE to children with autism as set forth in the New York State Regulations; and

z.   Defendant failed to provide the J.V.2 Plaintiffs with adequate PWN at legally required times throughout the years in question.

207.   Substantively, none of the IEPs offered a FAPE, and the recommendations contained therein were not reasonably calculated to confer educational benefit to J.V.2. Further, Plaintiffs were substantially excluded from the special education process.

208.   Defendant failed to conduct legally sufficient reevaluations of J.V.2 during the school years in question.

209.   J.V.2 did not make sufficient progress during any of the school years in question.

210.     Despite the fact that J.V.2 was not making appropriate progress in any of the relevant years, Defendant did not modify his Special Education Services.

211.     In sum, Defendant failed to engage in the IEP process in accordance with the IDEA. Among other issues, Defendant failed to adequately coordinate scheduling IEP meetings with L.V. and failed to consider the fact that L.V. was and is dealing with two serious emergency situations with her children and must arrange IEP meetings around her children's services. The children should not miss their services to accommodate Defendant. Rather than try to coordinate mutually convenient times for meetings with L.V., Defendant unilaterally scheduled IEP appointments.

Defendant's conduct throughout violates the IDEA, Section 504, and the ADA and is knowing, gross, reckless, and intentional.

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**
### **The IDEA**

212.     Plaintiffs repeat and reallege the allegations contained in all of the above paragraphs as if fully set forth herein.

213.     Defendant denied J.V.2 a FAPE for 2017-18 and 2018-19 school years.

214.     Defendant's application of blanket policies and practices to J.V.2's IEPs violated the IDEA.

215.     Defendant failed to adequately evaluate J.V.2 before the IEP meetings, failed to conduct a functional behavior assessment ("FBA") or Behavior Intervention Plan ("BIP"), and failed to administer adequate testing to determine if J.V.2 has Autism or any related disorder.

216.     The CPSE team for each IEP meeting was not properly constituted. Upon

information and belief, the team did not have its required members. Even if those

individuals were present, none possessed the required knowledge, training, or

independence to properly formulate a legal IEP team. Because the team was constrained

by what Defendant "offered," upon information and belief, none of the team's members

were able to fulfill their legally mandated roles. Upon information and belief, there was

no qualified individual present with an expertise in Autism. Upon information and belief,

there was no team member who had the qualifications to serve as a district representative.

None of J.V.2's service providers or proposed providers attended the IEP meetings.

217.     Defendant failed to issue any PWN before any IEP meeting. The IEP team wrote

the IEP without adequate, sufficient, or meaningful input from L.V., and L.V. was

deprived of the ability to meaningfully participate in the IEP development process.

218.     Defendant failed to recommend 1:1 instruction, ABA supervision, parent training,

sufficient SEIT, social skills instructions, home based services or applied behavior

analysis, or sufficient speech and language therapy, occupational therapy, physical

therapy and assistive technology and training in any of the IEPs. The IEP team pre-

determined the program and placement recommendations and utilized blanket policies of

Defendant instead of individualizing J.V.2's IEPs and his placements.

219.     In the IEP plans, Defendant failed to address the myriad of ways that J.V.2's

disabilities impacted his academic and functional performance in the following areas:

academics, ADL skills, behavior, focusing/attention, communication, social interaction,

generalization, self-care skills, community integration, and technology. Further,

Defendant failed to sufficiently address all the ways in which J.V.2's disabilities impacted his ability to make progress in the general curriculum.

220.    Defendant failed to timely provide L.V. with a copy of the November and December 2017 IEP documents.

221.    Defendant failed to implement material aspects of J.V.2's IEPs.

222.    Defendant failed to implement J.V.2's stay-put, pendency rights under the IDEA.

223.    Defendant has violated the IDEA by failing to adopt legally sufficient policies, procedures, and practices to ensure that the administrative due process system is functioning in accordance with the IDEA and minimum standards of Due Process.

224.    Defendant has violated the rights of Plaintiffs who are entitled to a due process system that complies with the IDEA.

225.    As a result of Defendant's actions, J.V.2 has suffered and continues to suffer irreparable harm in the form of serious regression in communication, feeding, behavior, socialization, academics, and emotional stability.

**SECOND CLAIM FOR RELIEF**
**SECTION 504 – DISCRIMINATION**

226.    Plaintiffs repeat and reallege the allegations contained in all of the above paragraphs as if fully set forth herein.

227.    J.V.2 is a qualified individual with a disability entitled to protection under Section 504. J.V.2 has a physical impairment that substantially limits one or more major life activities, including learning. His disabilities impact his ability to make progress in cognitive, developmental, academic, and functional areas. He exhibits delays in his social- emotional, behavioral, language, speech, communication, and sensory

functioning. As evidenced by his IEPs, J.V.2 has a record of such impairment and is regarded by Defendant as having such impairment.

228.     Defendant discriminated against J.V.2 under Section 504 by, *inter alia*, denying him reasonable accommodations; adopting systemic policies, procedures, and practices that violated J.V.2's rights under the IDEA and New York State law; and engaging in widespread and pervasive violations of the IDEA and New York State Education law.

229.     Defendant's conduct is knowingly, willfully, intentionally, recklessly, and grossly violative of the standards to which it is obligated to adhere to by law.

230.     Defendant discriminated and are discriminating against Plaintiffs based on their disabilities pursuant to Section 504 of the Rehabilitation Act by failing to provide reasonable accommodations to Plaintiffs.

231.     Children without disabilities do not need services to help them generalize their skills between different individuals and settings. J.V.2 requires autism services to gain equal access to and benefit from education in New York State.

232.     By denying his access to autism services, Defendant has discriminated, and are discriminating, against Plaintiffs based on his disabilities pursuant to Section 504.

233.     Defendant committed numerous violations of Plaintiffs' rights under the IDEA and have adopted blanket policies relative to IEPs and placements with respect to J.V.2.

234.     As a result of Defendant's actions, J.V.2 has suffered and continues to suffer irreparable harm in the form of serious regression in communication, feeding, behavior, socialization, academics, and emotional stability.

**THIRD CLAIM FOR RELIEF**
**SECTION 504 – RETALIATION**

235.     Plaintiffs repeat and reallege the allegations contained in all of the above

paragraphs as if fully set forth herein.

236. As a result of the Defendant's failure to accommodate J.V.2's disabilities, L.V. lodged

various complaints to request hearings with an IHO. These were protected activities

under Section 504.

237. Defendant knew or should have known that Plaintiff L.V. lodged such complaints, or

such knowledge is attributed to Defendant.

238. Upon information and belief, Defendant caused an ACS emergency visit to Plaintiffs'

home despite the pending state complaint to NYSED and the pending requests for the

IHO to fund McCarton. As a result, L.V. had an open ACS case, which subsequently

was deemed to be unfounded.

239. Defendant initiated the ACS "emergency" visit in retaliation to J.V.2's complaints, as

evident from the short interval between L.V.'s request in February 2019 for a hearing  to

compel Defendant to fund services at the McCarton Center and the ACS visit in March

2019.

240. As a result of such retaliation, Plaintiffs have been damaged in an amount to be

determined at trial.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983

241. Plaintiffs repeat and reallege the allegations contained in all of the above paragraphs as if

fully set forth herein.

242.  Defendant violated 42 U.S.C. §1983 by depriving Plaintiffs, under color of state law, of

their rights, privileges, and immunities under federal statutory and constitutional law.

243. By implementing, promulgating, and continuing to enforce and/or effectuate policies, practices, and customs as alleged herein, Defendant denied Plaintiffs educational services to which Plaintiffs are entitled to under the IDEA and New York law in violation of 42 U.S.C. § 1983.

244. By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and custom as alleged herein, Defendant has denied Plaintiffs of educational services to which they are entitled to under the IDEA and New York law, in violation of 42 U.S.C. §1983.

245. By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and custom of terminating the last agreed upon placement created by an unappealed order as of June 30th of every year, Defendant has deprived and will continue to deprive Plaintiffs of educational services to which they are entitled under the IDEA and New York State law, in violation of 42 U.S.C. §1983.

246. By failing to adopt adequate policies and procedures to prevent Plaintiffs from being illegally denied autism services to which they are entitled under the IDEA and New York State law, Defendant has violated 42 U.S.C. §1983.

247. By failing to supervise and train their employees and agents concerning due process and the laws and policies that protect the Plaintiffs from denial of educational services under the IDEA and New York State Education Laws, Defendant have violated 42 U.S.C. §1983.

248. Defendant violated the rights of Plaintiffs under 42 U.S.C. §1983 by failing to have adequate policies, procedures, protocols, and training to ensure that the long-standing provisions of the IDEA and Section 504 asserted herein were being implemented, which

deprived Plaintiffs of the right to education afforded them under state and federal law as a result.

249. Under color of state law, Defendant deprived Plaintiffs of their right to educational services without due process of law in violation of the Fourteenth Amendment of the U.S. Constitution.

250. By failing to ensure that the pendency orders were implemented, Defendant violated 42 U.S.C. § 1983.

251. As a direct and proximate result of Defendant's failures, Plaintiffs have suffered and continue to suffer irreparable harm including J.V.2's suffering serious regression in his communication, feeding, behavior, socialization, academics, and emotional stability.

## FIFTH CLAIM FOR RELIEF
## ADA – DISCRIMINATION

252. Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

253. J.V.2 is a disabled child under the ADA. J.V.2 has a physical impairment that substantially limits one or more major life activities, including learning. His disabilities impact his ability to progress in cognitive, developmental, academic and functional areas. He exhibits delays in his social-emotional, behavioral, language, speech, communication, and sensory functioning. As evidenced by the IEP, J.V.2 has a record of such impairment, and is furthermore regarded by Defendant as having such impairment.

254. Through Defendant's actions, Defendant unlawfully discriminated against the Plaintiffs on the basis of J.V.2's disability.

255. Defendant's discrimination against the Plaintiffs is evidence of bad faith or gross misjudgment. Defendant committed numerous violations of Plaintiffs' rights under IDEA and adopted blanket policies relative to IEPs and placements with respect to J.V.2.

256. As a result, J.V.2 has suffered and continues to suffer irreparable harm in the form of severe regression in communication, feeding, behavior, socialization, academics, and emotional stability.

**SIXTH CLAIM FOR RELIEF**
**NEW YORK EDUCATION LAW**

257. Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

258. Defendant has violated the rights of the Plaintiffs under the New York State Education Law §§3202, 3203, 4401, 4404 and 4410 and §200 of the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. §200.

259. Defendant denied J.V.2 FAPE for the 2018-2019 school years.

260. J.V.2 is entitled to additional compensatory education for the denial of a FAPE during the 2017-2019 school years.

261. The IHO violated J.V.2's due process rights under the IDEA by allowing Defendant to control the remedy at the hearing.

262. For the 2017-2019 school years, Defendant violated Plaintiffs' procedural and due process rights under the IDEA by failing to provide PWN that conforms to the IDEA.

263. For the 2017-2019 school years, Defendant violated Plaintiffs' rights under the IDEA, Section 504, the ADA, and New York State Education law by failing to evaluate and reevaluate J.V.2 in accordance with those laws.

264.     Defendant has failed to adopt policies, procedures, and protocols to ensure that

L.V. was provided: (a) legally compliant due process rights under the IDEA pursuant to

20 U.S.C. §1415; and (b) IDEA notices and safeguards, meetings and hearings.

265.     Defendant discriminated, and are discriminating, against Plaintiffs based upon

J.V.2's disability, race, and class association with his sibling and mother.

266.     Defendant's actions, and failure to act, has been knowing, gross, reckless, and

intentional.

267.     Defendant has violated the rights of Plaintiffs under the New York State

Constitution, New York State Education Law §§3202, 3203, 4401, 4404 and 4410 and

the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. Part

200.

## SEVENTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

268.     Plaintiffs repeat and incorporate each and every allegation set forth in the

preceding paragraphs.

269.     Defendant's actions as set forth above were outrageous and extreme, were taken

for the purposes of causing severe emotional distress to Plaintiffs, and did cause each

Plaintiff to suffer severe emotional distress, loss of education opportunity, loss of income,

and loss of quality of life.

## EIGHTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT

270.     Plaintiffs repeat and reallege the allegations contained in the allegations in all of the above paragraphs as if fully set forth herein.

271.     Plaintiffs are entitled to a declaratory judgment as follows:

a.  Defendant's application of blanket policies and practices in denying J.V.2 his FAPE violated the IDEA and New York Education Law;

b.  J.V.2 is a qualified individual with a disability entitled to protection under Section 504;

c.  Defendant DOE discriminated against J.V.2 under Section 504 by denying him reasonable accommodations and adopting systemic policies, procedures, and practices that violated his rights under the IDEA;

d.  Defendant DOE retaliated against L.V. under Section 504 by initiating a baseless ACS case against her;

e.  J.V.2 is a qualified individual with a disability entitled to protection under the ADA;

f.  Defendant DOE discriminated against J.V.2 under the ADA by denying him reasonable accommodations and by adopting systemic policies, procedures, and practices that violated his rights under the IDEA and New York Education Law;

g.  Defendant DOE discriminated against J.V.2 and L.V. under 28 U.S.C. § 1343(a), and were deprived of their due process rights; and

h.  Defendant DOE violated Plaintiffs' rights under § 1983 by failing to provide them with their IDEA rights and services and by failing to implement the two pendency orders issued by IHO Jeffrey J. Schiro, Esq.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a.   Assume jurisdiction over this action;

b.   Issue a preliminary and permanent injunction on behalf of Plaintiff J.V.2

      i.   Directing Defendant DOE to develop an IEP that complies with all the procedural aspects of the IDEA and which includes: (1) 1:1 instruction in a full day fund and provide enforce the Interim Order on Pendency issued on September 12, 2018 and the Interim Order Modifying Pendency Order issued on March 12, 2019;

c.   Issue an injunction that directs Defendant to provide services to J.V.2 as provided in the aforementioned two pendency orders through an alternative service provider that Plaintiff L.V. can agree to;

d.   Issue a preliminary and permanent injunction and order that contains, at a minimum, the following findings and relief:

      a.   A finding that J.V.2 has been denied FAPE during the 2017-2018 and 2018-2019 school years.

      b.   A declaration of rights in favor of Plaintiffs, declaring the conduct alleged herein to be illegal and in violation of the IDEA, the ADA, Section 504, § 1983, and New York State Education law.

      c.   Immediate provision of and/or funding for J.V.2's stay-put program and transportation as ordered by the IHO and compensatory pendency services at appropriate providers.

      d.   Compensatory education in the form of funding at an enhanced rate and/or reimbursement to Plaintiffs for the following:

      i.  1:1 instruction;

     ii.  ABA Supervision;

    iii.  PT, SLT, and OT;

    iv.  Assistive technology and AT training;

     v.  Compensatory Parent Counseling.

    vi.  Transportation via car service to and from any services with an appropriately trained travel companion.

e.  Prospective funding for a full-day program that provides 1:1 instruction (40 hours), ABA, ABA supervision, OT, PT and SLT, a 52-week school year, that includes in-school and home-based services, Parent training, and car service transportation with an appropriately trained travel companion that will prepare him for kindergarten.

f.  Funding for a program or service provider to fulfill (d).

g.  Payment and/or reimbursement to the parent for her hourly rate as J.V.2's travel aide during the time that the DOE does not provide travel services, including payment within 30 days of invoice submission.

h.  Reimbursement to the parent for any travel-related expenses she incurred, as well as lost income.

i.  A legally valid IEP that comports with the procedural aspects of the IDEA that includes OT, PT, SLT, 1:1 instruction, ABA, transportation, tutoring, ABA supervision, home-based services and an appropriate private placement that will prepare J. for kindergarten.

j.  A comprehensive set of independent evaluations at DOE expense, including but not limited to a neuropsychological assessment, an educational assessment, a speech and language evaluation, an occupational therapy evaluation, a physical therapy evaluation, a visual processing evaluation and any other evaluations necessary to assess J.V.2 in every area of disability.

k.  The DOE should continue to prospectively fund car service transportation with a qualified travel companion.

l.  Given the shortages and lack of program, there should be no rate cap and the DOE should be obligated to fund the rate necessary to facilitate implementation of services.

m.  The DOE should be held responsible for providing qualified service providers. L.V. may elect to select providers, at enhanced rates; however, the DOE cannot unilaterally delegate this obligation onto L.V.

53  Issue a declaratory judgment that Defendant has violated Plaintiffs' rights as alleged herein and that the actions, inactions, policies, procedures, and protocols of the Defendant violate the federal laws as alleged;

54  Issue Judgment on behalf of Plaintiffs that:

i.  Defendant DOE failed to provide a FAPE in violation of Plaintiffs' rights under the IDEA and the New York Education Law;

ii.  Defendant unlawfully discriminated against J.V.2 under Section 504, by excluding him from his right to receive a FAPE for the School Years 2017-2018, 2018-2019.

iii.   Defendant unlawfully discriminated against J.V.2 under Section

504, by excluding him from failing to accommodate his disability,

employing blanket policies and practices, and failing to due

process rights to L.V.

iv.   Defendant is enjoined from terminating the funding for J.V.2's 20

hours per week of 1:1 ABA services and parent training and

BCBA supervision until such time as: (1) J.V.2 is no longer

making progress as determined by an independent BCBA

following an evaluation funded by Defendant; or (2) J.V.2 is no

longer eligible for special education services in New York,

whichever is date is earlier;

v.   Directing Defendant to develop an IEP that complies with all of

the procedural aspects of the IDEA and which includes (1) 1:1

instruction in a full day ABA program as well as OT, PT. and SLT;

(2) twenty hours per week of 1:1 ABA services after school; (3)

supervision by a BCBA of his entire program; (4) parent training at

home; and (5) appropriate AT including an iPad, and parent

training for the communication system;

vi.   Granting, an order, directing Defendant DOE to deposit the sum

equivalent to the following: the sum of Five Hundred Dollars

($500.00) for each individual service provider, per session, per

hour, per day, for each service owed to J.V.2, into an account held

in trust for J.V.2, and to be controlled by L.V. This sum is to be

provided in addition to and not in substitution to any monetary damages awarded to Plaintiffs herein; and,

    vii.   Granting additional compensatory education and equitable relief in the form of special and general education services, assistive technology, parent training and extended eligibility to make up for the failure to provide a FAPE to J.V.2 for the 2017-2018, 2018-2019 School Years as requested in the DPC and ADPC, which would include extension of his eligibility.

55  Issue a Preliminary Injunction and a Permanent Injunction and Order with respect to Plaintiffs:

    i.   Enjoining Defendant from applying the blanket policies, practices and procedures alleged herein.

56  Issue a Declaratory Judgment on behalf of Plaintiffs declaring that the actions, policies, procedures, and protocols as alleged herein violate the governing laws;

57  Order damages under the applicable statutes and laws of at least ten million dollars;

58  Award Plaintiff reasonable attorneys' fees and costs incurred in connection with this action; and

59  Grant such other and further relief as this Court may deem just and proper.

Dated: September 20, 2019
      New York, New York

                         ADVOCATES FOR JUSTICE,
                         LEGAL FOUNDATION

_____/S/_____
BY: LAURA DAWN BARBIERI
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400, ext 712
(212) 285-1410 – fax
(914) 819-3387 – cell
lbarbieri@advocatesny.com