UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

L.V., on behalf of herself and her minor child,
J.V.2,

                                        Plaintiffs,

                      -against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

                                        Defendant.
-----------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: 7/8/2020             │
└─────────────────────────────────┘
```

**Report & Recommendation on
Plaintiffs' Motion for Emergency
Relief**

**19-CV-05451 (AT) (KHP)**

**TO:  HON. ANALISA TORRES, Unite States District Judge**

**FROM:  HON. KATHARINE H. PARKER, United States Magistrate Judge:**

          Plaintiffs J.V.2, a disabled five-year-old child within the meaning of the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq,* and L.V., on behalf of herself and

her minor child, bring this Motion for Emergency Relief (the "Motion") pursuant to Federal Rule

of Civil Procedure 65 and IDEA § 1415(j) seeking emergency injunctive relief against Defendant

New York City's Department of Education ("DOE").  (*See* Motion, ECF No. 67.)  Specifically,

Plaintiffs seek an order requiring Defendant—and its agents, officers, servants, representatives,

and employees—to implement the educational services provided for in the pendency order,

issued by an Interim Hearing Officer ("IHO") on September 6, 2019, as well as the creation of a

fund upon which Plaintiffs can draw to satisfy prospective payment requirements of potential

service providers.  Defendant opposes Plaintiffs' motion in all respects.

          For the reasons discussed below, I recommend granting the motion and ordering DOE to

immediately comply with the September 6, 2019 PO, so long as it can be done safely in

accordance with local health guidelines in light of the COVID-19 pandemic.

**BACKGROUND**

I.      **Factual and Administrative History[1]**

Plaintiff L.V. is a single mother of two children, both of whom have autism spectrum disorder.  Plaintiff J.V.2 is L.V.'s now five-year-old son who was three years old at the onset of this federal litigation.  J.V.2 has a recognized disability under the IDEA, ADA, and RA, is entitled to receive services under the IDEA.

Under the IDEA, all children with qualifying disabilities, aged three to twenty-one, are entitled to a free appropriate public education ("FAPE").  *See* IDEA, 20 U.S.C. § 1412(a)(1)(A). The main vehicle with which a state provides a qualified child with a FAPE is through an Individualized Education Program ("IEP").  There is no dispute that J.V.2 is a properly qualified child under the IDEA—thus entitling him to education services and a FAPE, and thus, an IEP—or that Defendant is the entity responsible for providing J.V.2 with a FAPE.

Prior to reaching the age of three, a child with a qualifying disability can receive some special education services under the IDEA's Early Intervention Program ("EI"), which New York State Department of Health institutes as relevant to this dispute.  *See generally* 20 U.S.C. §§ 1431 *et seq.*; N.Y. Pub. Health Law §§ 2540 *et seq.*  In 2017, when J.V.2 was two-and-a-half years old, L.V. had the EI conduct an evaluation of J.V.2 in anticipation of J.V.2's third birthday and entitlement to an IEP and FAPE.  (Declaration of L.V. ¶ 3, ECF No. 67-3.)  Effective July 19, 2017, the EI found J.V.2 eligible for certain services.  (L.V. Decl. ¶ 4.)  J.V.2 then received certain educational services from EI until March 2018.  (L.V. Decl. ¶ 5.)

---

[1] I will assume the parties' familiarity with the record and only state the facts relevant to my recommendation and analysis regarding the requested injunctive relief.

J.V.2 first became entitled to a FAPE when he turned three in April 2018, with services set to begin in the 2018-19 academic year.  At the beginning of the 2018 school year, J.V.2's current educational placement was determined by an IEP dated June 5, 2018, as set by the Committee on Preschool Special Education ("CPSE").  (*See* L.V. Decl. ¶ 8.)  Unsatisfied with the contents of that IEP, L.V. filed a Due Process Complaint the following day on June 7, 2018, pertaining to the 2017-18 and 2018-19 school years.  (L.V. Decl. ¶ 6.)  Shortly thereafter, L.V. initiated administrative proceedings against the DOE, resulting in several hearings and pendency orders from Interim IHO Jeffrey Schiro.  Over the course of the next fifteen months, IHO Schiro issued three pendency orders outlining the services to which J.V.2 was entitled under the IDEA:  an Interim Order on Pendency dated September 12, 2018; an Interim Order Modifying Pendency dated March 12, 2019; and a Second Order Modifying Pendency dated September 6, 2019 (the "September 2019 PO").  (Declaration of Min Baharov ¶¶ 5, 15, ECF No. 72.)  These services were mostly not provided to J.V.2.

At the time of the onset of the COVID-19 pandemic in New York City in mid-March of this year, J.V.2 was not receiving consistent services.  L.V., having learned DOE was providing tablet devices enabled with their own WiFi hot-spots to families, applied for such a device in late March.  (L.V. Decl. ¶ 21.)  L.V. received the device in late April, but was unable to effectively use the device with J.V.2 for his remote learning sessions, as J.V.2 would not sit still and the device's internet connection was not reliable.  (L.V. Dec. ¶ 21-22.)  L.V. then began her own research to locate private providers who would give in-person services to J.V.2, which, according to L.V., she was able to do.  (L.V. Decl. ¶ 24.)  However, those providers were not disclosed to DOE, and are currently unknown to the Court.  (Baharov Decl. ¶ 41.)

In the interim, DOE has attempted to troubleshoot the tablet device with L.V., but has been unable to successfully do so to date.  (Baharov ¶ 31-33.)

## II.     Procedural History

Plaintiffs filed their initial Complaint on June 11, 2019, shortly after the second pendency order was issued.  Plaintiffs then filed a First Amended Complaint on July 3, 2019 and a Second Amended Complaint on September 20, 2019.  On December 6, 2019, Defendant moved to dismiss the Complaint in its entirety—that motion is still pending.

The Plaintiffs, having not received the educational services from various IEPs and three pendency orders, and having experienced several setbacks related to the unavailability of Plaintiffs' previous attorneys, now seek immediate injunctive relief, while they continue to pursue their claims more generally.

## <u>DISCUSSION</u>

## I.     Legal Standards

### a.  *Section 1415(j)*

Section 1415(j), a provision of the IDEA known as the "stay-put" provision, provides as follows:

> "Except as provided in subsection (k)(4), during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed."

28 U.S.C. § 1415(j).  Subsection (k)(4) applies in situations when the parent(s) and governmental agency cannot agree over the "then-current educational placement of the child."  Further, while an applicant for a preliminary injunction ordinarily must show irreparable harm and the

likelihood of success on the merits, "where the IDEA's stay-put provision is implicated, the provision triggers the applicability of an automatic injunction designed to maintain the child's educational status quo while the parties' IEP dispute is being resolved."  *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 529 n.38 (2d Cir. 2020) (citing *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982) (Section 1415(j) "is, in effect, an automatic preliminary injunction")); *see also Arlington Cent. Sch. Dist. v. L.P.*, 421 F. Supp. 2d 692, 696 (S.D.N.Y. 2006) ("Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships.").  Finally, the stay-put provision exists to "provide stability and consistency in the education of a student with a disability," *Arlington Cent. Sch. Dist.*, 421 F. Supp. 2d at 696, and to maintain "the educational status quo while the parties' dispute is being resolved."  *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014).

**b.  *Preliminary Injunctions***

Outside of Section 1415(j), the Second Circuit has a two-pronged standard for applications seeking emergency injunctive relief, requiring the movant to show:  (1) that they will experience irreparable harm in the absence of the requested relief; and (2) either (i) the movant is likely to succeed on the merits, or (ii) there is a serious question on the merits and the balance of hardships favors the movant.  *See Ventura de Paulino*, 959 F.3d at 529; *Zvi D.*, 694 F.2d at 906.  Some courts in this Circuit also look to a third, optional prong, that asks whether the requested relief is in the public interest.  *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

## II.     Analysis

Plaintiffs seek two types of relief, requested in the alternative, pursuant to the stay-put provision of the IDEA, which requires the then-current placement of the child to be maintained throughout the duration of judicial and administrative proceedings brought under the IDEA. Plaintiffs ask this Court to order the DOE to immediately provide J.V.2 with the educational services outlined in the most recent pendency order.  In the alternative, Plaintiffs ask this Court to order DOE to create a unique fund, for J.V.2's benefit, containing sufficient funds for a full years' worth of services, as outlined in the pendency order, that L.V. can draw upon to apply to service providers she has identified.  The DOE is willing to provide Plaintiffs with the full panoply of services from the September 2019 PO order, but only insofar as it can be done entirely remotely, by utilizing a DOE-provided, hot-spot enabled tablet.  The DOE argues that Plaintiffs' application for emergency relief goes beyond the status quo of the last agreed upon placement insofar as it insists on in-person services and a fund to pay for such services in advance, rather than utilize the fee-for-service model used by the DOE.

For the reasons set forth below, I recommend ordering the DOE to provide the in-person services described in the September 2019 PO order to the extent they can be performed safely in light of the current COVID-19 pandemic, because the remote services are not currently accessible to J.V.2 insofar as they have not been tailored for his specific needs and therefore are insufficient to meet the requirements of the PO.  Plaintiffs' request for a prospective funding account goes beyond the IDEA's stay-put provision, and because Plaintiffs' do not meet the standard for this emergency injunctive relief, it should not be granted at this time.

a.  *Enforcement of September 2019 PO*

Section 1415(j) of the IDEA, the stay-put provision, confers certain pendency rights on individuals engaged in proceedings pursuant to Section 1415 of the IDEA.  Those proceedings affected by the stay-put provision include, but are not limited to, IHO proceedings, due process complaint proceedings, and state review officer proceedings.  The stay-put provision clearly requires "the child [to] remain in the then-current educational placement of the child," so long as no agreement between the educational agency and the parent otherwise exists.  Because the parties agree that the September 2019 PO is the "then-current educational placement" of J.V.2, Section 1415(j) fully controls J.V.2's pendency rights.  That PO requires, effective retroactively to May 17, 2019, the following:

(1) Ten (10) hours per week of 1:1 ABA therapy;

(2) Three (3) 45-minute sessions of Individual (1:1) Occupational Therapy per week;

(3) Four (4) 45-minute sessions of Individual (1:1) Speech and Language Therapy per week;

(4) Three (3) 45-minute sessions of Individual (1:1) Physical Therapy per week;

(5) Door-to-door car service transportation of J.V.2 to and from all special education instruction and related services mandated in the PO; and

(6) An appropriately trained[2] transportation aide to supervise J.V.2 during transport to and from special education instruction and related services delivered outside of J.V.2's home; and

---

[2] The September 2019 PO order defines "appropriately trained" to mean "that such transportation aide shall have at least the same qualifications, safety, and CPR training, fingerprinting, and criminal background check as required

(7)  Prompt payment of providers within thirty (30) days of its receipt of monthly

invoices of services rendered to J.V.2 by the providers.

(Exhibit A to Plaintiffs' Motion, ECF No. 67-1.)

The parties do not agree on whether the September 2019 PO requires the educational

services to be provided in person and, even if it does require in-person services, the DOE argues

that it should be excused from providing in-person services due to the COVID-19 pandemic and

the current governmental orders that closed New York City schools to avoid spread of the virus

and required schools to provide remote teaching.

It goes without saying that IHO Schiro did not contemplate, and could not have

contemplated, the outbreak of a global, viral pandemic in September 2019 when he issued the

PO.  As such, the September 2019 PO does not address how to deliver services during the

COVID-19 pandemic.  It also does not explicitly state whether the outlined services must be

provided in person, although it clearly contemplates in-person services.  For example, Section II

of the September 2019 PO is entitled "Transportation," and requires the DOE to provide

transportation of J.V.2 to a center where he can receive in-person services.  Indeed, many of

L.V.'s complaints pertain to DOE's alleged failure to provide a qualified transportation aide to

take J.V.2 to and from the various service providers outside of her home.  There also can be no

dispute that occupational therapy, physical therapy, and speech therapy for a child who is not

yet in kindergarten cannot be provided through a computer as well as they can be in person,

particularly if the child's home does not have an adequate space for learning (like L.V.'s small

---

under the Education Law and State Regulations of transportation attendants, monitors, and paraprofessionals
employed by the DOE."

apartment) or reliable WiFi (which L.V.  does not have).  (*See* L.V. Decl. ¶¶ 5, 21.)  Aside from a

passing remark that "thousands" of other special-education children within the DOE's system

have been using a DOE-provided tablet to engage in remote learning in satisfaction of IDEA-

mandated services and that the tablet it provided has its own hot spot, the DOE does not make

an argument regarding the sufficiency of remote learning for J.V.2 specifically.  (*See* Letter in

Opposition at 1, ECF No. 71; Baharov Decl. ¶ 20.)

At the heart of the IDEA is a free and appropriate public education, and the primary

vehicle used to deliver a free and appropriate public education is an Individualized Education

Plan.  *See Fry v. Napoleon Cmty. Sch.*, 580 U.S. __, 137 S. Ct. 743, 749 (2017).  From this title

alone, the IDEA's emphasis on the individual is made clear.  *See* 20 U.S.C. § 1412(a)(4).  The

IDEA further defines and outlines exactly how educational agencies should achieve the

individualized plans.  *See* 20 U.S.C. § 1414(d).  Nowhere in the DOE's opposition papers does it

attempt to consider the individual educational and special educational needs of J.V.2.  Nowhere

in the DOE's opposition papers does it explain how certain services that appear inherently

subject to in-person delivery, such as physical therapy, could be appropriately and remotely

delivered to J.V.2.   And, the DOE does not adequately explain why it failed to fully implement

the PO prior to the COVID-19 outbreak.

The DOE contends that L.V. is partly to blame for J.V.2 being denied services, stating

that she has been uncooperative, unreasonable, and unresponsive by, among other things,

failing to return calls to resolve IT problems and refusing to provide the names of providers

willing to provide in-person services to J.V.2 during this pandemic.  There is no question that

L.V. must cooperate in the process of finding a way to provide services to J.V.2 during the

pandemic, no matter how frustrating.  But the DOE, too, has failed to meet its obligations by failing to promptly identify providers and provide full services to J.V.2 for nearly two years. (*See* Second Amended Complaint ¶ 170, ECF No. 37; L.V. Decl. ¶¶ 6, 12, 25.)  The DOE does not dispute that service providers have quit and that there have been lengthy delays in locating alternative providers.  The DOE further admits the only services they have attempted to deliver remotely are physical therapy and SEIT instruction.  (*See* Baharov Decl. ¶¶ 37-40.)  L.V. is rightly frustrated with the inconsistent and incomplete provision of services to her son for nearly two years, notwithstanding the pendency orders.  Further, to the extent there have been problems with the remote, computer-based services during the COVID-19 pandemic, it is not appropriate to lay blame on L.V., a single parent with two young children with special needs and no significant income, for not making herself available to the DOE's IT department so that they can troubleshoot the DOE-provided device.  In this Court's experience, trouble-shooting computer problems can take hours—hours when someone else would have to look after J.V.2 and his sister, which requires caretaking resources that have not necessarily been available to L.V., especially during this pandemic.

In sum, the September 2019 PO contemplated delivery of in-person services, and DOE has not adequately explained how its computer-based services are a satisfactory substitute for J.V.2 during the COVID-19 pandemic, nor conducted an evaluation of how remote services can be delivered to J.V.2 to meet his individual needs.

Accordingly, I recommend that Plaintiffs be ordered to provide the names of the service providers who have indicated a willingness to provide in-person services to J.V.2 notwithstanding the current COVID-19 crisis and that the DOE utilize these service providers

provided they are qualified and accept the DOE rates, or locate other qualified service providers

willing to provide in-person services to J.V.2 at this time.  I also recommend ordering the DOE to

immediately conduct an independent assistive technology evaluation to assess J.V.2's individual

needs and the software required to deliver his required services, remotely, to the extent certain

services cannot be provided in-person due to the current pandemic.  I recommend this order

remain in effect for the duration of the 2020-21 school year, until final judgment is entered, or

until this Court otherwise modifies the recommended order, whichever may come first.

      **b.  *Prospective Funding Account***

      The alternative emergency relief sought by Plaintiffs is the creation of a fund for J.V.2's

benefit from which L.V. could withdraw funds to pay for services directly without having to wait

for reimbursement.  L.V. requests this relief on the grounds that she does not have the funds to

pay service providers and wait for reimbursement from the DOE and that the only service

providers willing to provide services to J.V.2 require up-front payment.

      This request goes beyond what is required by the September 2019 PO and, as such, is

not within Section 1415(j)'s automatic preliminary injunction rule.  Thus, Plaintiffs must meet

this Circuit's more general standards for emergency injunctive relief.  The Second Circuit

requires a party moving for emergency injunctive relief to meet two prongs.  First, the moving

party must show irreparable harm in the absence of the requested relief.  Second, the moving

party must show either (i) likelihood of success on the merits, or, (ii) serious questions on the

merits and a balance of hardships favoring the moving party.  Third, although not always

applied, some courts require the relief to be in the public interest.  As discussed below, because

Plaintiff's cannot show irreparable harm, Plaintiffs' are not entitled to the alternatively requested relief.

Irreparable harm is an "injury that is neither remote nor speculative, but actual or imminent and that cannot be remedied by an award of monetary damages." *See New York v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)).  Plaintiffs do not argue they will suffer irreparable harm if this relief is not granted.  While the failure of J.V.2 to receive services for an extended period during his early, formative years can certainly result in irreparable harm, it is far from clear that there are no service providers who can provide services without an up-front payment by L.V.  There are, according to L.V., service providers willing to provide services to J.V.2 in person during the pandemic but she has not provided the names of those providers to the DOE or the Court or any proof that these providers will not accept payment after services are provided.  It is also possible that the remote services could be tailored to J.V.2's needs with a proper evaluation, and no up-front fund is required for such services.

Plaintiffs fail to cite to case law in which such relief was ordered under similar circumstances.  Further, the DOE explains that a prospective funding account goes against DOE's policy of "fee-for-service."  (Baharov Decl. ¶ 42.)  The DOE has explained that it utilizes this fee-for-service model to ensure that providers are qualified, charging appropriate rates, and actually provide the services.  It uses this model to ensure it utilizes limited taxpayer dollars appropriately.  Although it appears the DOE's funding policy has already caused one service provider, the McCarton Center, to refuse to provide continued services to J.V.2, it is far from clear that there are no service providers who will accept the DOE's payment structure.

Accordingly, Plaintiffs have not demonstrated that they will suffer irreparable harm in the absence of this alternatively requested relief (i.e., a fund to use as L.V. sees fit for J.V.2's services), or that the balance of hardships weighs in favor of Plaintiffs with respect to this relief at this time.

## Conclusion

In light of the foregoing, I recommend Plaintiffs' Motion be granted in part.  Specifically, I recommend that the DOE be ordered to provide J.V.2 with in-person services as described in the September 2019 PO to the extent such can be done safely in compliance with guidance from health authorities and immediately conduct an independent assistive technology evaluation to assess J.V.2's individual needs and the software required to deliver his required services remotely if they cannot be provided safely in person during the pandemic.  I recommend this order remain in effect for the duration of the 2020-21 school year.

Dated: July 8, 2020                    Respectfully,
New York, New York

KATHARINE H. PARKER
United States Magistrate Judge

**<u>NOTICE</u>**

**Ordinarily, the Defendant will have seventeen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).  In that event, Plaintiffs will have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  However, given the nature of the emergency relief requested, both Plaintiffs and Defendants shall have <u>five</u> days from the services of this Report and Recommendation to file written objections.  *See Tribul Merch. Servs., LLC v. ComVest Grp.*, No. 12-CV-5063 (FB) (VMS), 2012 WL 5879523, at \*23 (E.D.N.Y. Nov. 21, 2012) (collecting cases in which objection periods were shortened due to exigencies).**

**Accordingly, if the Plaintiffs file written objections to this Report and Recommendation, the Defendant may respond to Plaintiffs' objections within <u>three</u> days after being served with a copy.  Alternatively, if Defendant file written objections, the Plaintiffs may respond to such objections within <u>three</u> days after being served with a copy.  Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Torres.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).**